[No. 3,430.]

# S. D. HOSMER *v.* W. T. WALLACE.

POWER OF COMMISSIONERS OF GENERAL LAND OFFICE. — The acts of the United States Register and Receiver, in permitting the entry of a parcel of public land by a pre-emptioner, are subject to the supervision and control of the Commissioner of the General Land Office, whether the matter is brought to his attention by appeal or otherwise.

IDEM.—In such case the Commissioner, and on appeal from him, the Secretary of the Interior, may set aside the entry if erroneous.

JUDICIAL REVIEW OF ACTS OF LAND OFFICERS.—In the absence of fraud on their part, or of fraudulent imposition on the officers of the United States Land Department, their determination on matters of fact relating to the entry of lands cannot be reviewed by the courts, but their decisions on questions of law may be.

IDEM.—In order to present a case in relation to the entry of lands of which courts of equity will take cognizance, it must distinctly appear, that the land officers were mistaken, not in the facts, but in the law of the case.

APPEAL from the District Court of the Third Judicial District, County of Santa Clara.

Bill in equity to have the defendant adjudged to hold in trust for the plaintiff, the title he acquired by a United States Patent to about fifty-four acres of land, and to be required to convey it to the plaintiff.

The plaintiff, in October, 1856, settled on the north half of the north half of sec. 1, T. P. 7 south, Range 2 west, Mount Diablo meridian, but his actual occupancy was confined to the north half of the N. E. ¼.

The north half of the north-east quarter was within the exterior boundaries of a Mexican grant called "Pastoria de los Borregas," which had been granted by the Mexican Government to Francisco Estrada. The grant was for two square leagues within exterior boundaries containing a much greater quantity of land. In 1862 the plaintiff was removed from the land afterwards patented to the defendant by a writ of restitution, in an action of ejectment in which one Lyons was plaintiff, said Lyons claiming title under said grant. The plaintiff removed on to the north half of the north-west quarter, where he afterwards continued to reside.

The defendant purchased the title of Lyons, to the north half of the north-east quarter before July, 1866. The grant was confirmed, but upon the final survey, the north half of the north-east quarter was excluded, and a patent for the grant was issued in 1865. All the title of Estrada to the lot in dispute, vested in the defendant before the survey. The defendant remained in possession of it by his tenants. The plaintiff intended to hold and claim all the land on which he originally settled as a pre-emptioner. The final survey of the grant was made in June, 1865, and in April, 1866, the township in which the land in dispute is located, was surveyed as public lands, and on the sixteenth day of July, 1866, the plaintiff filed his declaratory statement, and on the fourth day of September, 1866, he made payment and received a certificate of purchase for the whole of said north half of the north half of section one. On the twenty-fourth day of May, 1867, the defendant filed in the land office at San Francisco, his application to purchase the land in controversy, under the seventh section of the Act of Congress, approved July 23d, 1866, entitled "An Act to quiet land titles in California," alleging that he had purchased the same in good faith from a Mexican grantee, as a part of the grant "Pastoria de los Borregas." The defendant's application was allowed, and a patent was issued to him in October, 1871. The other facts are stated in the opinion.

*Moore, Laine & Leib*, for Appellant.

If Hosmer had the equitable title, he is entitled to have the respondent convey to him the legal title. (*Silver* v. *Ladd*, 7 Wallace, 219.)

When Hosmer made his proof, payment, entry, and purchase, and received his duplicate pre-emption receipt, the land *eo instanti* became private land, and was forever withdrawn from the jurisdiction of the National Land Department, and was not subject to a second sale by the United States. (*Witherspoon* v. *Duncan*, 4 Wallace, 210; *Astrom* v. *Hammond*, 3 McLean, 107; *Carrol* v. *Safford*, 3 Howard,

461; *The People* v. *Shearer*, 30 Cal. 646; *Stone* v. *Young*, 5 Kansas, 294.)

The land not only became private land by Hosmer's purchase, but his title could not be divested by the land officers, nor even by Act of Congress. The judiciary alone could control his title as against him, on a proper showing for fraud and the like. A second sale was nugatory as against Hosmer. This question is fully settled by the highest authority, without doubt. (*Meyers* v. *McCullough*, 1 Ind. 340; *Doe* v. *Stephenson*, 9 Ind. 144; *Morton* v. *Blankenship*, 5 Mo. 346; *Arnold* v. *Grimes*, 2 Iowa (Clark), 1; *Rogers* v. *Brent*, 5 Gil. Ill. 573; *O'Brien* v. *Perry*, 1 Black. 139; *Lindsy* v. *Hawes*, 2 Black. 560-1; *Stone* v. *Young*, 5 Kansas, 229.)

The certificate never issues in cases liable to appeal until all appeals have been finally determined; the certificate is the last and crowning act, the one that vests the title and beneficial estate in the land. In such a case if any fraud is practiced, or others have older equities, such matters can be disposed of by the Courts, but not by the ministerial officers of the Land Department.

Moreover, there could have been no appeal from the decision of the Register and Receiver in favor of Hosmer, because Wallace was not a party to that proceeding; he made no claim to the land until a year or more after Hosmer's entry and purchase, nor could there have been a new trial of any issue between them for the same reason. (*Morton* v. *Hunter's Lessees*, 1 Wheaton, 331; *U. S.* v. *Lathrop*, 17 Johns. 4.

It is claimed, however, that the Act of July 23d, 1866, withdrew this land from pre-emption as to Hosmer, and conferred a special privilege on the defendant to purchase the land in contest.

This we deny; it is not true that the Act of 1866 undertook to withdraw from the operation of the general pre-emption laws lands bought from a Spanish or Mexican grant that had been excluded from the final surveys of such grants; but, on the contrary, such lands were allowed to remain subject to the general pre-emption laws as they were before the Act of 1866.

The only change wrought by this Act was to allow the purchasers in good faith from these grants, to purchase the lands so bought of the grants, which they had improved and continued in the actual possession of, provided it could be done without interfering with the rights of pre-emptors under the general laws.   The Act of 1866 did not undertake to divest pre-emptors under the general laws of any rights or privileges they might have; but carefully guarded them by express provisions.

*George A. Nourse*, for Respondent.

The proof, payment, entry and purchase by Hosmer, and the delivery to him of the duplicate pre-emption receipt, gave him no vested right in the land so entered.   All these proceedings were by law subject to the supervision and control of the Commissioner of the General Land Office. When he set them aside, as appears by the findings, it was as if no entry of the land had ever been made, and the land became in the same condition as before its entry by Hosmer.

See the "Act to reorganize the General Land Office," approved July 4th, 1836, enacting:

"That, from and after the passage of this Act, the executive duties now prescribed, or which may hereafter be prescribed by law, appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and, also, such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the Government of the United States, shall be subject to the supervision and control of the Commissioner of the General Land Office, under the direction of the President of the United States."

Under this Act, no action of the Register and Receiver in regard to the sale of public lands is final; but all their acts are "subject to the supervision and control of the Commissioner of the General Land Office."

The cases cited by counsel to sustain his position (that by the entry of, and payment for the land, the equitable

title vests, *eo instanti,* in the purchaser), are cases where the validity of the entry was admitted, and so, no question being raised as to its confirmation or rejection at Washington, the effect was held to be, to vest at once the equitable title in the purchaser; to render the land no longer public, but private; and to make null and void any subsequent attempt of the land officers to sell again the same land.

But no single case can be found, arising since the said Act of July 4, 1836, which holds that an entry of land made at a United States local land office cannot, on proper grounds, be set aside by the Commissioner.

The very first case cited by counsel in support of the doctrine maintained by him (*Witherspoon* v. *Duncan,* 4 Wallace, 210), after first laying down the rule, as counsel claims it, as applied to a case where the entry is not set aside by the Commissioner, adds, p. 220: "It is true that the entry might be set aside at Washington, but this condition attaches to all entries of the public lands."

In *Carroll* v. *Safford,* 3 How. 461, also cited by counsel to same point, the Court (pp. 461–2) recognizes the liability of the original entry to be set aside at Washington for mistake or fraud in the entry; a case being mentioned of patents refused by the Government on fourteen out of one hundred entries.

In *People* v. *Shearer,* 30 Cal. 645, also cited for the appellant, the Court, in their opinion, repeat the general doctrine that the equitable title passes by entry and payment at the land office ; and then go on to say that the principle does not apply to that case, because no payment appeared there to be made for the land. So that case can hardly have weight, as a judicial decision, on the point here in controversy.

The land which was the subject of controversy in *Astrom* v. *Hammond,* 3 McLean, 107, also cited by counsel to same point, was entered in 1832, at the United States Land Office, four years before the Act passed giving the Commissioner supervision and control of all land sales. Of course no decision in such case could bear upon the case at bar, · arising under a different statute.

CAL. REPS. XLVII—30.

In *Mayer* v. *McCullough*, 1 Ind. 339, the conflicting entries were made, and patent issued to defendant's ancestor upon a junior entry, many years before the law of July 4, 1836, was enacted.

The case of *Doe* v. *Stephenson*, 9 Ind. 144, decides nothing in regard to a Commissioner's supervisory power in land matters. It only holds (p. 149) that the mere word "canceled," written across a certificate of purchase, is not sufficient evidence that it ever was, in fact, canceled by a competent authority. So far as the matter of title goes, it holds that a certificate of purchase (made by State law evidence of the legal title) would, in ejectment, override a State patent for the same land, of later date.

The case at bar, in so far as it relates to the vacating of the entry made by the plaintiff, is a case of the supervision and control over the acts of the local land officers, required by statute to be exercised by the Commissioner. We have, further, this decision of the Commissioner affirmed by the Secretary of the Interior, to whom the counsel for plaintiff says the appeal would lie, if to any one. But all the argument of counsel on this matter of appeal, falls to the ground, from the fact that this is not a dispute between rival claimants, under the Act of 1841; and so the case comes under the general provisions of the United States statutes relative to the sale of the public lands—not under the provisions of Act of 1841, relative to rival claimants under that Act.

The legal title to the land in dispute having, by the patent, vested in the defendant, said defendant cannot be declared by the Court a trustee, for the benefit of plaintiff, as regards said legal title, until it shall appear in the case that all the facts existed which entitled said plaintiff to a patent for the land in preference to the defendant.

So the plaintiff must aver and prove, in this action, not only his personal qualifications, as a pre-emptor, and his performance *in pais* of the acts required by law of a pre-emptor, under the Act of September 4th, 1841, but also that he proved these matters in the United States Land Office. Not having done this, his action must fall.

The omission of plaintiff to at least aver that he proved

before the land officers the facts (stating them), which entitled him to a patent, probably arises from a misconception of the principle upon which a Court of Equity reviews the action of the Land Department in such a case as the one at bar. This misconception can only arise from insufficient consideration of the matter; for a moment's thought will satisfy any lawyer that a Court does not, in such case, act as an appellate tribunal, reviewing the acts of executive officers on a *quasi* appeal. The Court acquires jurisdiction in such case, only as a Court of Equity would acquire it in any other case; by virtue of some alleged mistake, imposition or fraud in the issuing of the patent, or by reason of some trust to be enforced.

The mistake or fraud must be alleged, in order to be proven; and the trust cannot be held to exist in such case unless the facts are alleged and proved which create the trust.

By the Court, CROCKETT, J.:

The plaintiff appeals, on the judgment-roll alone, from a judgment in favor of the defendant; and the only question before us, is, whether on the pleadings and findings the plaintiff is entitled to the relief demanded. The principal question in the case, is, whether on the facts admitted by the pleadings or found by the Court, the action of the Register and Receiver, in permitting the plaintiff's entry and accepting the purchase price, was subject to the revision and control of the Commissioner of the General Land Office and the Secretary of the Interior. It appears from the findings, that after the plaintiff had proved up his preemption claim, and had paid the purchase money and obtained his certificate, the Commissioner of the General Land Office, on receiving "information of the claim of defendant to enter the land now in lots two and six, ordered and directed the Register and Receiver at San Francisco to investigate the entry and purchase of the north half of the north half of the said section one, made by plaintiff as alleged in the complaint, and directed said Register and Re-

ceiver to take such testimony as might be offered by said plaintiff and said defendant respectively, concerning their respective claims to said lots two and six, and to report the same with their decision thereon to said Commissioner." It further appears that in pursuance of this instruction, notice was given to the plaintiff and defendant, who appeared before the Register and Receiver, and litigated their respective rights. The decision of the Register and Receiver was in favor of the plaintiff, from which the defendant appealed to the Commissioner of the General Land Office, by whom the decision of the Register and Receiver was reversed, and the land awarded to the defendant. From this decision the plaintiff appealed to the Secretary of the Interior, who affirmed the ruling of the Commissioner; and on the return of the case to the Register and Receiver the defendant paid the purchase price and received a duplicate receipt therefor; whereupon a patent issued to him, under which he now holds the land.

The plaintiff claims that the patent wrongfully issued to the defendant, and ought rightfully to have issued to the plaintiff; and the object of the present action is to compel a conveyance of the legal title. The plaintiff claims the land as a pre-emptioner; and the defendant under the Act of Congress of July 23d, 1866, entitled "An Act to quiet titles in California." The plaintiff filed his declaratory statement of his intention to pre-empt the land a few days before the passage of the Act of Congress of July 23d, 1866, but did not prove up his claim and pay the purchase price until several months later. It becomes material, therefore, to inquire—first, whether, on the facts admitted by the pleadings or contained in the findings, the Commissioner of the General Land Office and the Secretary of the Interior had jurisdiction to set aside the decision of the Register and Receiver, awarding the land to the plaintiff; and if this question be answered in the affirmative, second, whether their action in the premises can be reviewed in the Courts in the absence of an allegation of fraud, accident, or a mistake of facts, induced by false affidavits or fraudulent practices. If the action of the Register and Receiver, in permit-

ting the plaintiff's entry and accepting payment of the
purchase money, was subject to be reviewed and set aside
by the Commissioner of the General Land Office, or, on
appeal, by the Secretary of the Interior, then it is plain
that the plaintiff has no title which a Court of Equity will
enforce, unless the action of these officers can be reviewed
on some ground of equitable cognizance to be alleged and
proved.    They have decided his case against him, and if
they had jurisdiction of the proceeding, and were empower-
ed by law to decide the controversy, their decision con-
cludes the plaintiff, unless it can be impeached on some of
the grounds on which Courts of Equity interfere to correct
errors of law, to prevent fraud, or to correct mistakes
superinduced by false representations or fraudulent practices.
On the question of jurisdiction it may be observed, *in
limine*, that under the land system of the United States, the
Commissioner of the General Land Office, subject to the
supervision of the Secretary of the Interior, is at the head
of the department having in charge the sale and disposal of
the public lands.    He is authorized to make rules and
regulations, not inconsistent with law, for the government
of the numerous subordinate officers, dispersed over a vast
territory, and many of them at remote points from the seat
of government.    The interests confided to this branch of
the public service are of great magnitude, affecting both
public and private rights; and the trusts reposed in subor-
dinate officers are capable of gross abuses.    Under these
circumstances, it is not a reasonable inference, that Con-
gress intended the decision of the Register and Receiver to
be absolutely final, in any matter pertaining to the sale of
public lands.    Before permitting the entry of a pre-emp-
tion claimant, they are required to take certain proofs
touching the qualification of the applicant, and the acts he
has performed to entitle him to purchase the land.    On the
theory of the plaintiff, if they should make a mistake, how-
ever gross in these respects, and award the land to a claim-
ant clearly not entitled to it, for lack of the necessary qual-
ification, or because of his failure to perform the requisite
conditions, the Commissioner of the General Land Office

would be wholly powerless to apply the proper remedy, by setting aside the entry and returning the purchase money, unless there should be an adverse claimant, who brought up the case on appeal. But if there were no adverse claimant, it is contended, the decision of the Register and Receiver would be absolutely final, and that on paying the purchase money and obtaining his duplicate receipt the claimant would thereby acquire an equitable title, which the Commissioner of the General Land Office or the Secretary of the Interior would be powerless to divest, by setting aside the entry, however clearly it might appear that the claimant was not entitled to the land. If the local officers were subject to no supervisory control in this respect, it is easy to see that the opportunities for fraudulent entries would be greatly multiplied, and that the land system would be capable of gross abuses. It was, doubtless, in view of this fact, and to promote uniformity in the administration of the laws for the sale of the public domain, that Congress, by the Act of July 4th, 1836, entitled "An Act to reorganize the General Land Office," enacted "that from and after the passage of this Act the executive duties now prescribed or which may hereafter be prescribed by law, appertaining to the survey and sale of the public lands of the United States, or in any wise respecting such public lands, and also such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the Government of the United States, shall be subject to the supervision and control of the Commissioner of the General Land Office, under the direction of the President of the United States."

This language is so explicit as to need no interpretation. If all the executive duties appertaining to the "sale of the public lands of the United States, or in anywise respecting such public lands," are to be "subject to the supervision and control of the Commissioner of the General Land Office," it is impossible to escape the conclusion that the acts of the Register and Receiver, in permitting an entry of a parcel of public land by a pre-emptioner, are subject to the "supervision and control" of the Commissioner, whether

the matter be brought to his attention by appeal or otherwise. His duty to supervise and "control" the acts of his subordinates is not made to depend upon the accidental circumstance whether there be adverse claimants of the land. If his authority was thus limited, it would open the door to numerous frauds; and, in a large class of cases, there would be no means of correcting the mistakes and blunders of incapable local officers. We are supported in these views by the late case of *Johnson* v. *Towsley*, 13 Wallace, p. 72.

We are, therefore, of opinion, that the Commissioner of the General Land Office, and the Secretary of the Interior on appeal, had the jurisdiction to "control" the action of the Register and Receiver in permitting the plaintiff's entry, and had lawful authority to set it aside if erroneous.

It remains to be considered to what extent the action of these officers may be reviewed in the courts. It is a rule resting on reason, and authority as well, that in the absence of fraud, or fraudulent imposition on the officers of the land department, their determination of matters of fact is not open to review in the courts. Being a special tribunal to which the law confides the duty of deciding upon facts which are brought in question before them, their decision, if free from fraud, and not the result of a fraudulent imposition upon them, is final and conclusive. They may err in their judgment as to the weight of testimony, or may decide directly against the evidence.

But no appeal lies to the Courts to correct such errors. (*Johnson* v. *Towsley, supra.*) If every disappointed applicant for the purchase of a quarter section of land could appeal from the decision of the Land Department to the Courts, on controverted questions of fact, the delays would be most vexatious, and the litigation interminable. But these officers are not above the law, which prescribes a rule of conduct for them, and to which their official acts, like those of all other executive officers, are subject. If, on an an admitted state of facts, they perform an act not authorized by law, the Courts will redress the wrong, or apply the proper corrective. The Courts have frequently exercised

jurisdiction in such cases, and have reversed the action of the Land Department, in awarding the land to one person, when the law awarded it to another, and that, too, in the absence of any charge of fraud or imposition.

In entertaining jurisdiction in this class of cases, Courts of Equity proceed on the principle that the Land Department is not an *imperium in imperio*, whose decisions of purely legal questions are absolutely final; but, on the contrary, that when the controversy involves no disputed question of fact, which it is the peculiar province of that department to decide, the Courts, in proper cases, will correct its erroneous rulings on questions of law. But in the case at bar, it does not appear, either from the pleading or findings, what facts were proved before the Register and Receiver; the only averment in the complaint on this point being "that he made proof of his said pre-emption claim and right, under the laws of the United States of America, to the satisfaction of the Register and Receiver of the United States Land Office," etc. The decision of the Register and Receiver, however, was not satisfactory to the Commissioner of the General Land Office, who ordered them "to investigate the entry and purchase of the north half of the north half of the said section one, made by the plaintiff," and directed them to take such testimony as might be offered by the plaintiff and defendant respectively, and to report the same, with their decision thereon, to the Commissioner. The testimony was accordingly taken, but it does not appear what facts were proved on this second investigation. The decision of the Register and Receiver being again in favor of the plaintiff. was again disapproved by the Commissioner, in respect to the land in controversy, and his decision was affirmed, on appeal, by the Secretary of the Interior. For aught that appears in this record, the decision of the two highest officers of the Land Department at Washington, in rejecting the plaintiff's claim, may have turned wholly upon the question of the sufficiency or insufficiency of his proofs, to entitle him to pre-empt the land under the general pre-emption law. The proofs are not before us; and if they were, it is the exclusive

province of the Land Department to decide upon the sufficiency or insufficiency of the evidence to establish the necessary facts. Nor do the pleadings or express findings negative the inference, that in the opinion and judgment of the Commissioner and Secretary, the plaintiff's proofs were insufficient to establish his claim under the general pre-emption laws. The only facts found or admitted by the pleadings on this branch of the case are, that the plaintiff made proof of his claim to the satisfaction of the Register and Receiver, and that the Commissioner, on receiving information of the defendant's claim, ordered a reinvestigation of the plaintiff's claim; whereupon new proofs were taken, and another decision rendered by the Register and Receiver, in favor of the plaintiff, which was reversed by the Commissioner and Secretary, by whom the land was awarded to the defendant. There is nothing in the record to rebut the inference, that the decision of these officers may have proceeded wholly on the ground that in their judgment, the plaintiff's proofs were not sufficient to establish the performance of the necessary acts to entitle him to the benefit of the general pre-emption laws.

In order to present a case of which a Court of Equity would take cognizance, it ought distinctly to have appeared that the Commissioner was mistaken, not in the facts, but in the law of the case. As we have already seen, his judgment on the facts cannot be reviewed in the Courts, in the absence of fraud or imposition, whilst his decision of questions of law may be. The pleadings and findings fail to show that the error, if there be one, of the Commissioner and Secretary, was not purely an error of fact, and not of law.

Judgment affirmed. Remittitur forthwith.

The Chief Justice being a party to the action, did not sit in the cause.

Mr. Justice RHODES did not express an opinion.